Patrick V. Dahlstrom (*Pro Hac Vice*)
Louis C. Ludwig (*Pro Hac Vice*)
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:     (312) 377-1181
Facsimile:     (312) 377-1184
E-mail:         pdahlstrom@pomlaw.com

Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, California 90210
Telephone:     (818) 532-6449
E-mail:         jpafiti@pomlaw.com

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TERRAVIA HOLDINGS, INC., SECURITIES LITIGATION | Case No.:  16-cv-06633-JD |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates To ALL CASES | Judge James Donato |
| | CLASS ACTION |
| | **<u>JURY TRIAL DEMANDED</u>** |

Craig Taffel, Casey Minnick, Dimitrios Daniil, Ali Alkhateeb, and Yisroel Lieber (collectively "TerraVia Investor Group") ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiff undersigned attorneys, for Plaintiff's complaint against Defendants (defined

below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things (a) review and analysis of regulatory filings made by TerraVia Holdings, Inc. ("TerraVia" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by TerraVia; (c) public statements, documents, conference calls and announcements issued and disseminated by the Company, Jonathan S. Wolfson, Apurva S. Mody, and Tyler W. Painter (collectively, "Defendants"); (d) securities analysts' reports and advisories about the Company; (e) a private investigation including interviews of certain former TerraVia employees, as well as former employees of related relevant entities; and (f) review of other publicly available information concerning TerraVia, including information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired TerraVia securities between May 4, 2016 and November 6, 2016, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      The Company creates and sells a variety of products developed from algae, particularly food, nutrition, and specialty ingredients.  Its platform uses microalgae to produce high-value triglyceride oils, proteins, fibers, micronutrients, and other ingredients, including algal flour.

3.   The Company, which was formerly known as Solazyme, Inc. ("Solazyme"), was incorporated in 2003 and is headquartered in San Francisco, California.

4.   The Company began its life as a biofuel startup trafficking in algae-based oil, but struggled to expand as a purveyor of other algae-derived products, including nutritional products, after the biofuels market fizzled in 2012 and 2013.

5.   In March 2016, the Company changed its name from Solazyme to TerraVia Holdings, Inc. to reflect its rebranding from an energy company to a maker of nutritional foods.  Prior to May 11, 2016, the Company traded under the ticker symbol "SZYM."

6.   At all relevant times, Defendants were motivated to protect the Company's nutritional food business, which had become the Company's core operational focus by March 2016.

7.   In Spring 2016, while the Company's full-fledged transformation into a maker of nutritional foods was ongoing, Colorado-based EN-R-G Foods LLC ("EN-R-G") announced the recall of its Honey Stinger brand protein chews, which contained TerraVia's algae ingredient, after customers reported becoming violently ill.

8.   Separate investigations of the incident by Honey Stinger, its supplier, and the U.S. Food and Drug Administration ("FDA") all determined that the Company's algae ingredient in the protein chews was the cause of the illnesses.

9.   By May 2016, Honey Stinger's distributor communicated this determination to TerraVia.

10.   In June 2016, the Company sent a letter to its customers acknowledging that **"[t]here have been a modest number of reports of adverse gastrointestinal (GI) reactions to products containing AlgaVia® Protein-Rich Whole Algae"** (the "Honey Stinger letter").  (Bold added).

11.     However, the Company never publicly disclosed the Honey Stinger letter nor the information contained therein to investors.

12.     In October 2016, Rosa Foods, Inc. ("Soylent") temporarily halted shipments of one of its just-add-water beverage mixes, as well as Soylent "meal-replacement bars," after acknowledging that some of its customers had "experienced gastrointestinal issues after consuming Soylent Bars."  Soylent also recalled those bars.  Two weeks later, Soylent stopped sales of its beverage mix.  Both products used the latest iteration of the company's formula, Soylent 1.6.

13.     On November 7, 2016, *Bloomberg* published an article entitled "Soylent Thinks It Found What Was Making People Sick: Algae",[1] stating that an the Company's algal flour ingredient used in Soylent 1.6 caused consumers to experience gastrointestinal distress, including nausea and vomiting, and that Soylent would be removing algal flour altogether from its product formulations by early 2017.

14.     Despite the Company's Senior Vice President Mark Brooks ("Brooks")'s adamant denial that the Company's algal flour was responsible, *Bloomberg* further revealed that the Company had sent a the Honey Stinger letter in July to a distributor of Honey Stinger, ***"warning that [TerraVia] had received a 'modest number of reports' showing that algal protein can cause 'gastrointestinal distress,' according to a copy seen by Bloomberg"***—similar ailments to those reported by Soylent consumers.  (Emphasis added.)

15.     On this news, the Company's share price fell $0.15 per share, or 8.11%, to close at $1.70 per share on November 7, 2016, thereby damaging investors.

16.     On December 20, 2016, the Company retaliated against Solyent by announcing in a press release the suspension of supplying its ingredients to Solyent, effective immediately.

---

[1] Publicly available at https://www.bloomberg.com/news/articles/2016-11-07/soylent-thinks-it-found-what-was-making-people-sick-algae

17.     By late December 2016, Soylent shipped a reformulated Solyent 1.7 drink mix that does not contain the algal ingredients.

18.     A Soylent spokesperson stated that TerraVia's refusal to supply its ingredients to Soylent would have "no impact" on the business, though TerraVia had previously emphasized the importance of Soylent to *its* business.

19.     As a result of Defendants' false and/or misleading statements, TerraVia securities traded at inflated prices during the Class Period.  However, after disclosure of Defendants' false and/or misleading statements, TerraVia's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78b-1 and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b) as the Company's principal executive offices are located in this Judicial District.

23.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

5

## **PARTIES**

24.     Plaintiff members, as set forth in the certifications that accompanied their application to serve as Lead Plaintiff, incorporated by reference herein, purchased TerraVia securities at artificially inflated prices during the Class Period and has been damaged thereby.

25.     Defendant TerraVia is incorporated in Delaware in 2003 and is headquartered at 225 Gateway Boulevard, South San Francisco, California 94080.  The Company's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "TVIA."

26.     Defendant Jonathan S. Wolfson ("Wolfson") served as the Company's Chief Executive Officer ("CEO") from 2008 until August 2016.

27.     Defendant Apurva S. Mody ("Mody") has served as the Company's CEO since August 2016.

28.     Defendant Tyler W. Painter ("Painter") has served the Company's Chief Financial Officer since 2007 and Chief Operating Officer since 2014.  Painter sold 12,500 shares of TerraVia common stock on June 7, 2016 – during the Class Period – at $2.6742 per share.

29.     Defendants Wolfson, Mody and Painter are sometimes collectively referred to herein as "Individual Defendants."

30.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

31.     The Company is liable for the acts of the Individual Defendants and their employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

32.     The scienter of the Individual Defendants and other employees and agents of the Company are similarly imputed to TerraVia under *respondeat superior* and agency principles, as well as the fact that TerraVia's "nutritional food" business comprised its core operations by the time the Class Period began.  Indeed, in the Company's quarterly report filed with the SEC on Form 10-Q at the start of the Class Period, TerraVia acknowledged that "[w]e are highly dependent upon a number of key members of our senior management, including manufacturing, business development and scientific personnel, and on our directors."

## SUBSTANTIVE ALLEGATIONS

### Background

### Solazyme's Inception

33.     In 2003, Defendant Wolfson and Harrison Dillon ("Dillon") founded the Company as Solazyme.  It began as an unusual startup biotech company aimed at developing oil from algae for the emerging renewable energy market.

34.     As Defendant Wolfson explained in 2012, startup companies need little more than office space and computers; a biotech venture requires lab equipment and technical expertise. "Most biotech

companies are spun out of a university," he said. "There are almost no examples of successful biotechs started from scratch because of the high barriers to entry."[2]

35.    Nonetheless, Defendant Wolfson and Dillon spent the next year living together in a house in Palo Alto, California growing "several thousand strains of algae[,]" by Defendant Wolfson's estimation, in their garage while simultaneously working to develop a business model.

36.    Defendant Wolfson and Dillon claimed to have spent the better part of two years experimenting with growing different strains of algae in ponds.  But while the organisms grew and produced oil, Defendant Wolfson and Dillon concluded that the production cost was too high as it would take thousands of acres of water to mass produce the oil.

37.    By this time, the startup had begun to attract investors, most notably Jerry Fiddler, the founder and former CEO of the software company Wind River Systems.

38.    Defendant Wolfson and Dillon fashioned a solution based on the ability of some algae to can grow in the dark, if fed properly.  While most algal strains are autotrophic, using light to make their own food through photosynthesis, other strains are heterotrophic—they can bypass photosynthesis altogether by consuming plant sugars that have already converted sunlight into energy.  Accordingly, Dillon and Defendant Wolfson shifted their focus to cultivating heterotrophic microalgae that could be fermented in darkened tanks.  Without sunlight, the algae need nutrients to grow.  The Company used—and continues to use—cane sugar to provide this plant-based cellulose, in stark contrast to other algae oil makers who grow their algae in open ponds under natural sunlight.

39.    "We basically went back to our investors and said, what we were doing wasn't working, but we'd like you to fund this," Dillon said. "We were really nervous about them dropping us [.]"

---

[2] "Oil Change" Emory Magazine (Spring 2012), publicly available at:
http://www.emory.edu/EMORY_MAGAZINE/issues/2012/spring/features/solazyme.html

40.     However, the investors proved amenable to this sharp break with traditional methods of algae cultivation. "There was a lot of logic to it—the whole reason we started with algae is because of its capability to make oil, but it was doing two things, photosynthesis and then making oil," Defendant Wolfson recalled. "We said, those are two different processes, and we can create indirect photosynthesis by feeding sugars to algae in fermentation. By doing that we get to leverage an infrastructure that's already available."

41.     Initially, the Company focused on making what's known in the fuel industry as a "drop-in solution"—oils that can be pumped straight into the tanks of existing planes, trains, and automobiles, without mixing or modification.

42.     For example, in late 2009, the Company received a $21.8 million federal grant from the Department of Energy to build a biorefinery (which was ultimately completed in 2012), and the U.S. Navy contracted with the Company for more than 130,000 gallons of its alternative fuel for testing during 2010 and 2011.

43.     Defendant Wolfson would later sum up the Company's original *raison d'être* as follows: "We were trying to use the power of biotechnology to solve environmental problems, and make money[.]"[3]

44.     To that end, the Company raised $125 million in venture funding—from a list of investors including Morgan Stanley, Chevron's venture capital arm, and Richard Branson—thus enabling the Company go public.

**Initial Public Offering and Expansion**

45.     In May 2011, the Company held an initial public offering (IPO) of more than ten million

---

[3] "Solazyme shoots high with algae makeover" Reuters (Feb. 22, 2012), publicly available at: http://www.reuters.com/article/us-smallbiz-solazyme-feb-idUSTRE81L1ZO20120222

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
9

shares at a stock price of $18.00 per share, raising about $227 million, with 7,901,800 shares sold for $20.00 per share each in the first day of trading.

46.     At the time, market commentators focused on the Company's potential as a fuel – rather than food – company, touting its government contracts and "impressive progress along the cost curve towards parity with fossil-based oil[.]"[4]

47.     Shares of the Company rose as high as $27.47 per share soon after and the Company was considered one of the rare exits for a cleantech startup in 2011.

48.     However, revenue eventually stagnated as the market for biofuels soured.  The value of the Company's fell by half in the months following the IPO.  This prompted Defendant Wolfson and his research and development team to investigate alternative revenue streams.

49.     In the fourth quarter of 2011, the Company posted a wider-than-expected net loss of $15.6 million, compared with $2.9 million in the same quarter in 2010.  Revenue dropped to $14.9 million compared with $23.2 million in the fourth quarter of 2010.

50.     In 2012, Defendant Wolfson acknowledged that "[i]n order to succeed, we had to pivot. It was adapt or die. We had to make adjustments to our business plan and the technology[.]"  Spinning the setback positively, he stated, "[w]e were right that algae was the best platform to make oil but wrong about how to do it."

51.     Dillon concurred: "[e]xpanding to other markets was a major shift in strategy that went against conventional wisdom. Fuel is a trillion-dollar market …. But for us, diversification has been a good thing. We could build highly successful, profitable products a lot faster in these areas."[5]

---

[4] *See* "Solazyme IPO nets up to $227M" BiofuelsDigest (May 27, 2011), publicly available at: http://www.biofuelsdigest.com/bdigest/2011/05/27/solazyme-ipo-nets-up-to-227m/

[5] In 2013, Dillon announced his decision to step down from his full time position as CEO and member of Board of Directors of Solazyme.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

10

52.     Pavel Molchanov, a Houston-based energy analyst at Raymond James quoted by Reuters in February 2012, accurately predicted that "Solazyme isn't likely to become in the foreseeable future a fuel-centered business."

53.     Nevertheless, in the Spring of 2012, the Company opened commercial-scale algae biorefinery in Peoria, Illinois.  The Peoria facility was partly funded with a U.S. Department of Energy grant in order to demonstrate the feasibility of producing algae oil on a commercial scale.

54.     With a malleable product in search of a market, the Company developed a range of oils and products for various purposes and filed some 280 patent applications in the U.S. and abroad between its inception and the Spring of 2012.

55.     In one instance, the Company's food chemist experimented with microalgae and discovered that it could be used as a cosmetic that protects against sunlight or lack of moisture.

56.     Subsequently, in October 2011, the Company partnered with Sephora in starting a microalgae-based luxury skincare line called Algenist.

57.      By 2015, Algenist accounted for approximately 70% of the Company's total product revenue.  As late as the first quarter of 2016, the Company was still a cosmetics company for all intents and purposes, with Algenist accounting for 82% of the Company's product revenue.

58.     Algae also proved capable of producing ingredients that could be marketed for use in cookies, snacks and other foods.  Thus, in addition to its efforts in the fuels and cosmetics industries, the Company began developing a food ingredient line known as AlgaVia.  The Company launched AlgaVia in 2014 and received "GRAS" certification the same year.[6]

---

[6] "GRAS" is an acronym for the phrase **G**enerally **R**ecognized **A**s **S**afe.  To obtain a GRAS designation, a company merely proffers evidence – which may consist of published scientific studies – that the product in question is safe for its intended use.  As a result, the additive avoids being subject to the stricter standards of FDA pre-market approval.  GRAS certification may be obtained where the manufacturer has performed its due diligence (consisting of submitting the aforementioned

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
11

59.     The AlgaVia brand provides food manufacturers with algae powders that purport to offer protein and lipids.  Made from algae that's about 50 percent oil, algalin (or, in commercial parlance, "algal") flour—which looks like coarse, yellow-gold powder—was touted as a healthier alternative to high-fat ingredients.

60.     By contrast, the Company's AlgaWise brand sells algae-based food oils, and also received GRAS certification.

61.     Both AlgaVia and AlgaWise act as suppliers to food manufacturers, a capability the Company touted – particularly regarding Soylent – as early as its October 31, 2015 earnings call:

> Next slide, ***important new customers are not only formulating new products, but also talking about our ingredients.*** As you can see on this slide, Enjoy Life Foods, a division of Mondelez has incorporated AlgaVia whole algae protein into their new range of gluten-free vegan baking mixes to help fulfill their brand promise to be free from the top eight allergens, while providing an excellent protein source for consumers in foods such as chocolate brownies and muffins. ***Soylent has successfully launched its first ready to drink beverage, choosing AlgaWise Algae Oil as the ideal source from proved lipid nutrition, superior flavor and stability.*** And we recently achieved our first European sales for both whole algae protein and whole algae flour to customers in the bakery category, where we hope to discuss more on this front in the near future.

62.     The Company's Peoria facility was repurposed from a biotech refinery to focus on food production.

63.     In March 2016, the Company officially changed its name to TerraVia Holdings Inc. with a redefined focus on food, nutrition, and personal care.

64.     In keeping with this focus, TerraVia acquired both AlgaVia and AlgaWise from Solazyme.

---

evidence), and submitted a GRAS notification to inform the Food & Drug Administration of a determination that the use of a substance is GRAS.  Following evaluation the FDA may simply respond that it does not question the basis for the notifier's GRAS determination.  This response is referred to as a "No Question" letter."

65.     *The Motley Fool*, a stock news website, summed up the change as follows:

Last year, **Solazyme** (NASDAQ:TVIA) was focused on selling everything from cosmetics to drilling lubricants, food ingredients to specialty fuels. After a combination of manufacturing delays, market development snafus, and tanking commodity prices, the company decided it was time to narrow its focus to its most promising opportunity: food ingredients.

66.     The Company's pivot to a food company allowed for a $28 million capital raise in March 2016 from a group of investors including Glenhill Capital, VMG Partners, PowerPlant Ventures, ARTIS Ventures, Simon Equities and several influential food industry CEOs.

67.     In August 2016, the Company sold the majority of its stake in Algenist for $20.2 million in cash and a 20% equity stake in Algenist.

**Honey Stinger**

68.     In April 2016, Honey Stinger announced a recall of one of its products after customers reported becoming violently ill after consuming Honey Stinger chewable tablets. All of Honey Stinger's products are manufactured by a third party, Santa Cruz Nutritionals of California ("Santa Cruz"), using the Company's algae ingredients.

69.     "We will be glad to replace the product with other, unaffected Honey Stinger products. If you purchased these products from a retailer please return the product to the store," Honey Stinger wrote in a letter to consumers or retailers who may have purchased the chews, adding that this action was considered a "Voluntary Field Correction" in FDA terms.

70.     Confidential Witness ("CW") 1 has worked as the Quality Assurance Compliance Manager for Santa Cruz since 2012, continues to work there, and has direct knowledge of the steps Santa Cruz took to investigate the allegations concerning algae ingredients.

71.     CW1 stated that the recall was highly significant since manufacturing nutritional food has been Santa Cruz's sole focus for a long period.  Given the severity of the situation, CW1 stated that

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

13

Santa Cruz's first step was to determine was whether Santa Cruz's own actions had caused people to get sick.  Santa Cruz's second step was to figure out how it happened.

72.    CW1 stated the investigation had two objectives: The first was to rule out – or rule in – any acts by Santa Cruz that could have contributed to the illnesses. The second, based on eliminating every other possibility, focused on determining whether TerraVia's algae product had been the cause.

73.    CW1 stated that Santa Cruz's internal investigation at concluded with a determination that there was not a problem on Santa Cruz's end.

74.    By contrast, CW1 stated that Santa Cruz's an inquiry into TerraVia's algae product reached a finding of near-certainty that TerraVia's algae product was the problem.

75.    CW2 worked as Honey Stinger's National Grocery Manager and its National Sales Manager from 2014 until June 2016.

76.    CW2 stated that following Honey Stinger's introduction of a new line of protein chews in late March, 2016, customers became violently ill, prompting a strong reaction from retailers in April 2016 as well as a recall by Honey Stinger itself.

77.    CW2 stated that Honey Stinger's testing ruled out its own protein ingredient as the culprit of the outbreak.

78.    CW3 is a partner at EN-R-G, which owns Honey Stinger.

79.    CW3 stated that the first thing EN-R-G did was to start testing the product internally. EN-R-G pulled individual samples and conducted tests on everything in its inventory.  EN-R-G performed the standard tests—Salmonella, e-coli, normal pathogens—for issues that could be the cause. According to CW3, all of these samples came back clean.

80.    CW3 further stated that Santa Cruz was informed right away.  CW3 personally dealt with Santa Cruz President Randy Bridges ("Bridges") as soon as EN-R-G got the complaints.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

81.     CW3 said that while EN-R-G was testing internally, Santa Cruz started testing all of its equipment and techniques and did not find anything wrong on its end either.

82.     As of May 2016, Bridges notified Terravia that the Company's algae ingredient was the cause of the sick customers, after CW3 and Bridges reached this conclusion by process of elimination and though timing considerations.

83.     The Company responded to Bridges's notification with the Honey Stinger letter, which appears on the Company's letterhead, bears an "Effective Date" notation of June 27, 2016, and is reproduced in full below:

### Sensitivity and Intolerance to AlgaViaTM® Whole Algal Protein

TerraVia's AlgaVia® Protein-Rich Whole Algae Powder is a whole food ingredient containing protein plus fiber, healthy lipids and micronutrients. AlgaVia® Protein-Rich Whole Algae Powder is incorporated as an ingredient in a variety of common food, beverage and supplement products on the market today. Use levels vary by application, but typically range from 2-10% of a final product's recipe. AlgaVia® protein has been available on the commercial market since 2014.

TerraVia"s AlgaVia® Protein-Rich Whole Algae Powder is made from *Chlorella protothecoides*. *Chlorella* microalgae, a naturally occurring source of various macro and micronutrients, have been an accepted part of the human diet for hundreds of years. *Chlorella protothecoides* is a green algae that was originally discovered in 1894 in the Netherlands and catalogued in a library. TerraVia™ has spent 13 years of research, screening over 100,000 algae strains to find those most optimal for use as food ingredients.

AlgaVia® protein is manufactured by cultivating and harvesting a pure, native strain culture under heterotrophic conditions in fermentation tanks, rather than being photosynthetically grown in open ponds like most *Chlorella* products. We take simple sugars and feed them to the algae culture in the closed fermentation tanks. The algae's natural metabolic processes convert the sugars directly into oils and protein. The whole algae cells are then washed, dried and milled. Our tightly controlled manufacturing process occurs in a pre-sterilized, closed system, therefore avoiding the risk of product contamination from other organisms, heavy metals or other allergenic substances (such as shellfish protein, etc.) from the environment. Virtually all adverse reactions to *Chlorella* are related to pond-derived varieties being consumed.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

15

*There have been a modest number of reports of adverse gastrointestinal (GI) reactions to products containing AlgaVia® Protein-Rich Whole Algae, but given all available data on usage, they represent a very low incidence rate for the total amount of product consumed by the population.* No cases of allergic reactions, including anaphylaxis or others have ever been observed. *All observed adverse reactions to date have been related to some degree of gastrointestinal distress, ranging from nausea to vomiting, cramps and diarrhea (symptoms display in varying degrees of intensity, and not all symptoms occur in every case).* Most adverse reactions can be attributed to a food intolerance to either *Chlorella* or to proteins in general, and these occur below an expected degree of normal intolerance to plant-based ingredients among the general population. *In most cases, lower levels of AlgaVia® protein can be tolerated, with GI issues arising only from higher use levels. This tolerance suggests that there may be an individual threshold limit for the product. Individuals who experience an adverse reaction after consumption of products containing AlgaVia® Protein-Rich Whole Algae should consider either avoiding it or reducing the serving size of the product containing it.*

AlgaVia® Protein-Rich Whole Algae (algal protein) is Generally Regarded as Safe (GRAS) in compliance with FDA regulations concerning substances for food use. An expert panel reviewed the published safety data and all processing information, and confirmed the safety for intended use. A GRAS Notice to the FDA (GRN 519) received a "No Questions" letter from the FDA on completion of review.

http://www.accessdata.fda.gov/scripts/fdcc/?set=GRASNotices&id=519

For additional questions or information, please contact your TerraViaTM sales representative

[Emphasis added].

84.     Tellingly, the Company has never made the information regarding reports of gastrointestinal distress contained in the Honey Stinger letter publicly available.

85.     CW1 stated that several FDA investigators visited Santa Cruz facilities in June 2016. CW1's revelation of an FDA inspection is corroborated by CW4, who worked as a quality control specialist and document control specialist for Santa Cruz from August 2015 until October 2016.  CW4 reported to CW1 and was directly involved in Santa Cruz's investigation into the cause of the illnesses.

86.     According to CW1, the FDA investigators wanted to know if Santa Cruz had done anything that caused or contributed to the problem.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

16

87.     CW1 stated that after the investigators spent at least five days at Santa Cruz, the FDA absolved Santa Cruz of any wrongdoing whatsoever.

88.     CW1 stated that the FDA didn't immediately issue a formal ruling, but told Santa Cruz that TerraVia's algae product was the cause.  In particular, the FDA said some people have allergies and bad reactions to TerraVia's algae product and the FDA certain that was the reason why people were getting sick.  To CW1's knowledge, this was the FDA's final conclusion.

89.     CW1 stated that Santa Cruz has since ended its relationship with TerraVia and has not used any of its products since the Honey Stinger problems began.

**Soylent**

90.     In 2013, Soylent introduced a protein drink, which became popular as an on-the-go food substitute for time-pressed Silicon Valley tech workers. By 2014, Soylent said it was selling 30,000 units a month.

91.     The premise, as one industry commentator put it, is that "[f]or $2 a serving, techies too busy to cook for themselves can pour the powder mix into a glass of water and imbibe a nutrient-rich, if bland-tasting, meal."[7]

92.     In June 2016, Soylent introduced Soylent 1.6, the "latest iteration in convenient, complete powdered food." It also touted a key addition to this latest version. "Soylent 1.6 is the first powder iteration to use whole algal flour and high oleic algal oil—innovative ingredients that are yet another step toward sustainable food production," Soylent said at the time.

93.     The algal components in Soylent 1.6 were TerraVia's algae products.

---

[7]    https://www.bloomberg.com/news/articles/2016-11-07/soylent-thinks-it-found-what-was-making-people-sick-algae

94.    In mid-October 2016, Solyent recalled its Soylent Bar, which contained the same formula as Soylent 1.6, just a month after that product hit the market.

95.    Customers had taken to online forums, such as Twitter and Reddit, to report a variety of gastrointestinal problems they said were caused by eating Soylent Bars. Many said the snack was making them nauseous. Others complained of vomiting and diarrhea. At least two people said they had gone to the hospital.[8]

96.    "The vomiting lasted several hours. I think it was probably the worst vomiting episode I ever experienced," one Reddit user wrote.[9]

97.    On October 27, 2016, Solyent halted sales of its flagship powder drink product and revealed that those consumers were displaying similar symptoms:

> During our review, we noticed that a handful of consumers (less than 0.1%) who consumed Powder 1.6 over the past several months reported stomach-related symptoms that are consistent with what our Bar customers described. Interestingly, we didn't see similar complaints during the 1.5 formulation. This possible connection allows us to narrow the field considerably given there are only a few ingredients that are specific to only our bars and Powder 1.6.

98.    At first, the symptoms were confusing: not every customer was getting sick, and Soylent, like Santa Cruz and Honey Stinger, claimed that all tests for food pathogens, toxins, or outside contamination had come back negative. However, Soylent realized over time that the set of its consumers who were having the problems were using Soylent 1.6 in particular.

---

[8] Olivia Zaleski, "Soylent Will Stop Selling Two Meal Products and Rework Formula After Illnesses." Bloomberg Technology (Oct. 28, 2016), publicly available at: https://www.bloomberg.com/news/articles/2016-10-28/soylent-will-stop-selling-two-meal-products-and-rework-formula-after-illnesses

[9] https://www.reddit.com/r/soylent/comments/5649ks/how_many_here_have_experienced_vomiting_after/

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

18

99.    "Interestingly, we didn't see similar complaints during the 1.5 formulation," said Soylent in a blog post on their website. "This possible connection allows us to narrow the field considerably given there are only a few ingredients that are specific to only our bars and Powder 1.6."

## Materially False and Misleading Statements

100.    The Class Period begins on May 4, 2016, when the Company issued a press release entitled "TerraVia Reports First Quarter 2016 Results" (the "Q1 2016 Press Release").  In the Q1 2016 Press Release, Defendant Wolfson stated, in relevant part:

> TerraVia's emergence as a food, nutrition and specialty ingredients focused company is well underway …. Over the last two months, we've expanded the customer base for our AlgaVia Lipid-Rich Whole Algae Powders and Proteins, and we've initiated deliveries to Unilever under our new $200 million supply agreement. Today, we introduced AlgaPrime DHA for the aquaculture market with our partner Bunge including the announcement of AlgaPrime DHA's first supply agreement with a global aquaculture leader. These and other initiatives are designed to leverage our transformational algae platform to deliver true and much-needed innovation in food, nutrition, and specialty ingredients. We're excited about the momentum we're building at a time when consumer demand for healthier alternatives is on the rise.

101.    In the Q1 2016 Press Release, the Company stated, in relevant part:

> TerraVia™ (Solazyme, Inc.) is a next generation food, nutrition and specialty ingredients company that harnesses the power of algae, the mother of all plants and earth's original superfood. With a portfolio of breakthrough ingredients and manufacturing, ***the Company is well positioned to help meet the growing need of consumer packaged goods and established and emerging food manufacturers to improve the nutritional profile of foods without sacrificing taste, and to develop select consumer brands.*** The Company also manufactures a range of specialty personal care ingredients for key strategic partners. Headquartered in South San Francisco, ***the Company's mission is to create products that are truly better for people and better for the planet.***

(Emphasis added).

102.    The statements referenced in Paragraphs 100-101 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

19

of this fact; (iii) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (iv) the Company had overstated the commercial viability of its algal products; (v) the Company's algal products did not "improve the nutritional profile of foods" by virtue of causing the aforementioned symptoms; (vi) the Company's algal products were not "truly better for people and better for the planet" due to their causing the aforementioned symptoms; and (vii) as a result of the foregoing, the Company's business and prospects were worse than represented.

103.   On May 6, 2016, the Company issued a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  In the Q1 2016 10-Q, which was signed by Painter, the Company stated:

> We are a food, nutrition and specialty ingredients company that harnesses the power of algae, the origin of all plants. Our innovative platform uses microalgae to produce high-value triglyceride oils, proteins, fibers, micronutrients and other ingredients. The inherent flexibility of our technology platform and the broad usage of these materials across multiple industries, allow us to approach a wide range of customers across myriad end markets. Moving forward, Solazyme will be known as TerraVia™.
>
> The unique composition of our oils, powders and other algae-derived products address specific customer requirements. ***We are commercializing high-value oils and powder products to companies that primarily use them as ingredients.*** We have developed and are commercializing products for specialty food ingredients, animal nutrition ingredients, consumer food products and specialty skin and personal care ingredients. Over our history, we have invested in and developed products, technology and market opportunities in the industrials area, which includes fuels, industrial oils, and the oilfield/Encapso™ business. In line with our strategy to focus our commercial efforts on food and specialty personal care ingredients, we expect to pursue strategic alternatives for the industrial business and our objective will be to identify partners who have the operational capabilities needed to realize the potential of those businesses.
>
> Our food oils are formulated to offer a variety of functional benefits such as enhanced structuring capabilities and stability while providing robust formulation and process flexibility. These food oils have the potential to improve upon conventionally utilized specialty fats and oils and ***our high oleic algae oil has received an FDA generally recognized as safe (GRAS) "No Questions" letter***. Currently, these oils are commercially available in our AlgaWise™ branded food oil platform and in our consumer culinary oil Thrive® brand. In addition, we have developed novel methods of preparing powdered forms of triglyceride oils and vegan proteins, and our powdered

ingredients are composed of unmodified whole algae cells. ***AlgaVia® Lipid Powder (commonly known as whole algae flour) and AlgaVia® Protein (commonly known as whole algae protein) are whole algae ingredients that can improve the nutritional profile of foods and beverages***. AlgaVia®Lipid Powder is a new fat source that allows for the reduction or replacement of dairy fats, oils, and eggs. AlgaVia® Protein is a new vegan source of protein that is free of known allergens and gluten. ***Both AlgaVia® Lipid Powder and Protein can be used across a range of applications such as beverages (ready-to-drink and powdered), bakery, snacks, bars, dressings, sauces and frozen desserts and have received FDA GRAS "No Questions" letters.***

(Emphasis added).

104.    The statements referenced in Paragraph 103 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (iv) the Company had overstated the commercial viability of its algal products; (v) the Company's algal products were not "high-value" in that they caused the aforementioned symptoms, thus seriously diminishing their commercial viability; (vi) the Company's algal products did not "improve the nutritional profile of foods and beverages" where they caused the aforementioned symptoms; (vii) the FDA GRAS "No Question" letter did not designate the Company's algal products as safe; indeed, the Company had direct knowledge by this time that its algal products were not safe; (viii) the Company's algal products could not be safely used across a range of applications because they caused the aforementioned symptoms; and (ix) as a result of the foregoing, the Company's business and prospects were worse than represented.

105.    On May 4, 2016, the Company held its Fiscal Q1 2016 Earnings Conference Call (the "Q1 2016 Earnings Call). During the Q1 2016 Earnings Call, Defendant Wolfson stated:

As we announced in mid-March, we are moving forward as TerraVia, a food, nutrition, and specialty ingredients company, ***focused on harnessing the power of our***

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

21

*transformational algae platform to make products that are better for people and the planet.*

(Emphasis added).

Defendant Wolfson further stated that:

Just a recap for folks new to TerraVia, our mission is to deliver true innovation to the food, nutrition, and specialty ingredients markets, by making products that are better for people and the planet. We have a portfolio of ingredients that are already in products and on store shelves today. These ingredients enable our customers to capitalize on a strong consumer movement toward better tasting, healthier, more sustainable, and plant based eating. It starts with algae, the mother of all plants and Earth's original super-food. Next slide.

We have all the proof points in place to become a truly important player in a large market. Our opportunity is supported by more than a decade of investing in our algae-based platform, and our significant achievements to date, including building a leading innovation platform with a deep intellectual property portfolio, establishing commercial scale food grade manufacturing now in operation, receiving critical regulatory clearances for our products, expanding and cementing relationships with our two anchor partners Bunge and Unilever, ***developing a portfolio of products with great taste and texture that are validated in the marketplace*** and in products selling on store shelves today, and nurturing a deep innovation pipeline with new products. Next slide.

(Emphasis added).

Defendant Wolfson also stated:

In the eight weeks since our last call, our AlgaVia and AlgaWise ingredients continue to gain traction in the market. Our AlgaVia powders platform consists of two products: AlgaVia Lipid-Rich Whole Algae Powder, and AlgaVia Protein-Rich Whole Algae Powder, both of which are produced at our Peoria facility today and have regulatory clearances for sale in the US, Europe, and other markets. We've also recently received a letter of no objection from Health Canada for our lipid-rich powder, giving that product full North American regulatory clearance including Mexico[.]

AlgaVia Lipid-Rich Whole Algae Powder can replace or reduce dairy fats and eggs while delivering comparable taste and mouth feel, leading to large reductions in fat, saturated fat, cholesterol and calories, without compromise.

…

***AlgaVia Whole Algae Protein continues to gain traction with producers of protein-rich beverages and snacks like Soylent and Honey Stinger.***

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

22

In addition, Defendant Wolfson stated:

> While it is early days for TerraVia in commercializing food, nutrition, and specialty ingredients, food industry innovators, established food leaders, and established personal care leaders are all embracing our products.  They're an important part of the trend toward healthier, better-tasting food, and more sustainable ingredients.

Finally, Defendant Wolfson stated that:

> ….the increase in traction we're seeing with our AlgaVia Whole Algae Powders and AlgaWise and Thrive Oils, *further demonstrates that consumers as well as emerging and leading food companies are beginning to embrace algae*. We're off to a great start, and are ready to tackle the challenges ahead while we deliver on TerraVia's potential.

> (Emphasis added)

106.    The statements referenced in Paragraph 105 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (iv) the Company had overstated the commercial viability of its algal products; (v) the Company's algal products were not "better for people and the planet" by virtue of their causing the aforementioned symptoms; (vi) the Company's algal ingredients did not enable the Company's customers to capitalize on a strong consumer movement toward better tasting, healthier, more sustainable, and plant based eating in that they represented commercial risk to those customers due to causing the aforementioned symptoms; (vii) the Company's algal products were not "validated in the marketplace and in products selling on store shelves today" and had, in fact, been subject to a recall due to causing the aforementioned symptoms; (viii) any market "embrace" of the Company's algal products was conditioned on the Company's omission of the fact that those products cause the aforementioned symptoms; (ix) the Company's algal products were not "gaining traction" with Honey

Stinger, which was undergoing a recall due to the aforementioned systems and had informed TerraVia that it was the cause of those symptoms; and (x) as a result of the foregoing, the Company's business and prospects were worse than represented.

107.    On the same call, Defendant Painter stated that:

We have a tremendous opportunity at the right moment in the food industry to create stockholder value from our technology platform and we believe **we have all the pieces in place to deliver on this opportunity**, anchor partnerships, commercial food grade manufacturing and operation and a portfolio of products that significantly enhance taste and texture, deliver an improved nutritional profile and economic sustainability.

(Emphasis added).

108.    The statements referenced in Paragraph 107 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (iv) the Company had overstated the commercial viability of its algal products; (v) the Company did not have "all the pieces in place" to create stockholder value because the Company's algal products caused the aforementioned symptoms; (vi) the Company's algal products did not have the potential to deliver an "improved nutritional profile" due to causing the aforementioned symptoms; and (vii) as a result of the foregoing, the Company's business and prospects were worse than represented.

109.    On August 8, 2016, the Company issued a press release entitled "TerraVia Reports Second Quarter 2016 Results" (the "Q2 2016 Press Release").   In the Q2 2016 Press Release, Defendant Wolfson stated, in relevant part:

I believe that the last five months since our announced transition to TerraVia have been the most productive in the company's history … Our second quarter progress in commercialization, production and product development, combined with the Algenist transaction and appointment of Apu Mody as our next CEO, puts us firmly on course to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

24

becoming a leader in food and ingredients leveraging our breakthrough algae platform. *We are excited about the opportunities we see to serve demand for healthier and more sustainable food and ingredient alternatives that are better for people and the planet.*

(emphasis added).

110.    In the Q2 2016 Press Release, the Company stated, in relevant part:

TerraVia is a next-generation food, nutrition and specialty ingredients company that harnesses the power of algae, the mother of all plants and earth's original superfood. With a portfolio of breakthrough ingredients and manufacturing, *the Company is well positioned to help meet the growing need of consumer packaged goods and established and emerging food manufacturers to improve the nutritional profile of foods without sacrificing taste*, and to develop select consumer brands. The Company also manufacturers a range of specialty personal care ingredients for key strategic partners. Headquartered in South San Francisco, *the Company's mission is to create products that are truly better for people and better for the planet.*

(emphasis added).

111.    The statements referenced in Paragraphs 109-110 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that Company's algal products caused the aforementioned symptoms; (iv) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (v) the Company's "opportunities … to serve demand for healthier and more sustainable food" were dramatically limited by the fact that Company's algal products caused the aforementioned symptoms; (vi) the Company had overstated the commercial viability of its algal products; (vii) the Company's algal products did not "improve the nutritional profile of foods" by virtue of causing the aforementioned symptoms; (viii) the Company's algal products were not "truly better for people and better for the planet" due to their causing the aforementioned symptoms; and (ix) as a result of the foregoing, the Company's business and prospects were worse than represented.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
25

112.    Also on August 8, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").   In the Q2 2016 10-Q, signed by Painter, the Company stated:

We are a food, nutrition and specialty ingredients company that harnesses the power of algae, the origin of all plants. Our innovative platform uses microalgae to produce high-value triglyceride oils, proteins, fibers, micronutrients and other ingredients. The inherent flexibility of our technology platform and the broad usage of these materials across multiple industries allow us to approach a wide range of customers across myriad end markets. In May 2016, we changed our name from "Solazyme, Inc." to "TerraVia Holdings, Inc.", and changed our Nasdaq ticker listing from SZYM to TVIA. With the transition to the TerraVia brand and our refined focus on food, nutrition and specialty ingredients, we announced in March 2016 our intention to attract a new CEO with proven industry experience in food and nutrition to drive commercial growth. On August 8, 2016, we announced the appointment of Apu Mody as our Chief Executive Officer, effective upon the commencement of his employment with TerraVia, expected to occur on or about August 22, 2016.

The unique composition of our oils, powders and other algae-derived products address specific customer requirements. ***We are commercializing high-value oils and powder products with companies that primarily use them as ingredients***. We have developed and are commercializing products for specialty food ingredients, animal nutrition ingredients, consumer food products and specialty skin and personal care ingredients. Over our history, we have also invested in and developed products, technology and market opportunities in the industrials area, which includes fuels, industrial oils, and the oilfield/Encapso® business. In line with our strategy to focus our commercial efforts on food and specialty personal care ingredients, we expect to pursue strategic alternatives for the industrials business and our objective will be to identify partners who have the operational capabilities needed to realize the potential of those businesses.

Our food oils are formulated to offer a variety of functional benefits such as enhanced structuring capabilities and stability while providing robust formulation and process flexibility. These food oils have the potential to improve upon conventionally utilized specialty fats and oils and our high oleic algae oil has received an FDA generally recognized as safe (GRAS) "No Questions" letter. Currently, these oils are commercially available in our AlgaWise® branded food oil platform and in our consumer culinary oil Thrive® brand. In addition, we have developed novel methods of preparing powdered forms of triglyceride oils and vegan proteins, and our powdered ingredients are composed of unmodified whole algae cells. ***AlgaVia® Lipid Powder (commonly known as whole algae flour) and AlgaVia® Protein (commonly known as whole algae protein) are whole algae ingredients that can improve the nutritional profile of foods and beverages.*** AlgaVia®Lipid Powder is a new fat source that allows for the reduction or replacement of dairy fats, oils, and eggs. AlgaVia® Protein is a new vegan source of

protein that is free of known allergens and gluten. ***Both AlgaVia® Lipid Powder and Protein can be used across a range of applications such as beverages (ready-to-drink and powdered), bakery, snacks, bars, dressings, sauces and frozen desserts and have received FDA GRAS "No Questions" letters.*** In May 2016, we and Bunge announced that we launched a native, whole algae DHA, docosahexaenoic acid, a long chain omega-3 fatty acid as a sustainable specialty feed ingredient, prioritizing the aquaculture market.

(Emphasis added).

113.    The statements referenced in Paragraph 112 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that the Company's algal products caused the aforementioned symptoms; (iv) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (v) the Company had overstated the commercial viability of its algal products; (vi) the Company's algal products were not "high-value" in that they caused the aforementioned symptoms, thus seriously diminishing their commercial viability; (vii) the Company's algal products did not "improve the nutritional profile of foods and beverages" where they caused the aforementioned symptoms; (viii) the FDA GRAS "No Question" letter did not designate the Company's algal products as safe; indeed, the Company had direct knowledge by this time that its algal products were not safe and had privately disseminated that knowledge; (ix) the Company's algal products could not be safely used across a range of applications because they caused the aforementioned symptoms; and (ix) as a result of the foregoing, the Company's business and prospects were worse than represented.

114.    That same day, August 8, 2016, the Company held its Fiscal Q2 2016 Earnings Conference Call (the "Q2 2016 Earnings Call).  During the Q2 2016 Earnings Call, Defendant Wolfson stated:

> Overall, we're making strong progress commercially in food and nutrition. In combination, we've seen our food product revenue, including AlgaVia, AlgaWise, and Thrive, grow significantly reflecting a growth rate of 170% in the first half of 2016 versus the first half of 2015, and we're hopeful to maintain or accelerate this growth through the remainder of the year. Next slide.

> As we announced in March, with the transition to the TerraVia brand and our refined focus on food, nutrition, and specialty ingredients, we believed it was vital to bring in a new CEO with deep food industry experience to drive commercial growth. As many of you know, we've spent over a decade unlocking the power of algae to find and develop vital food, nutrition, and specialty ingredients, healthy oils and fats, proteins, fiber, and micronutrients. I strongly believe that we've put all of the major pieces in place for success. Just as the key trends of plant-based eating, enhanced nutrition and better sustainability in what we eat are accelerating.  And recognition that algae is the mother of all plants and earth's original super food is growing fast.

115.    The statements referenced in Paragraph 114 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea and vomiting; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that the Company's algal products caused the aforementioned symptoms;  (iv) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (v) the Company had overstated the commercial viability of its algal products, and was therefore not making strong progress commercially in food and nutrition; (vi) due to the Company's algal products causing the aforementioned symptoms, those products were inconsistent with "enhanced nutrition"; and (vii) as a result of the foregoing, the Company's business and prospects were worse than represented.

116.    On November 2, 2016, the Company issued a press release entitled "TerraVia Reports Third Quarter 2016 Results" (the "Q3 2016 Press Release").  In the Q3 2016 Press Release, Defendant Mody – the newly-appointed CEO – stated, in relevant part:

> I believe we are in an important moment for innovation in the food industry. TerraVia's revolutionary platform gives us the opportunity to be a major factor in addressing the growing demands for plant-based, healthy and sustainable food and nutrition products … Since joining the company just a couple months ago, I have had the opportunity to spend significant time with our teams, visit the production facilities in Peoria and Brazil, and meet with our strategic partners and many customers. Everything I have seen and heard reaffirms my initial belief in what the company has built and the opportunities ahead.
>
> At the same time, we are identifying areas where we have more work to do … We are refining our strategic plan over the next couple of months to position the company for focused growth. Based on what I've seen in a very short time, *we have the capability to deliver innovation to the food and nutrition industry for many years to come*.

(Emphasis added).

117.    In the Q3 2016 Press Release, the Company stated, in relevant part:

> TerraVia is a next-generation food, nutrition and specialty ingredients company that harnesses the power of algae, the mother of all plants and earth's original superfood. With a portfolio of breakthrough ingredients and manufacturing, *the Company is well positioned to help meet the growing need of consumer packaged goods and established and emerging food manufacturers to improve the nutritional profile of foods without sacrificing taste*, and to develop select consumer brands. The Company also manufactures a range of specialty personal care ingredients for key strategic partners. Headquartered in South San Francisco, *the Company's mission is to create products that are truly better for people and better for the planet*.

(Emphasis added).

118.    The statements referenced in Paragraphs 116-117 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea, vomiting, and diarrhea; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that the Company's algal products caused the aforementioned symptoms; (iv) the Company's algal products were therefore unlikely to be a

competitive product in the market for nutrition foods; (v) the Company's "capability to deliver innovation to the food and nutrition industry" was dramatically limited by the fact that the Company's algal products caused the aforementioned symptoms; (vi) the Company had overstated the commercial viability of its algal products; (vii) the Company's algal products did not "improve the nutritional profile of foods" by virtue of causing the aforementioned symptoms; (viii) the Company's algal products were not "truly better for people and better for the planet" due to their causing the aforementioned symptoms; and (ix) as a result of the foregoing, the Company's business and prospects were worse than represented.

119.    Also on November 2, 2016, the Company held its Fiscal Q3 2016 Earnings Conference Call (the "Q3 2016 Earnings Call). During the Q3 2016 Earnings Call, Defendant Mody stated:

> I believe strongly that we have a tremendous opportunity ahead of us. TerraVia is a company on a mission to improve the lives of people by ***making products that are better for people and better for the planet***. Getting the business part right is vital to making that difference more broadly. I've spent the better part of my career in major food companies such as Mars and Del Monte Foods, and I've also worked with smaller companies. So, I've seen both ends of the spectrum, each bringing innovative food products to market.
>
> I believe we are in a really important moment in the food industry. Major food companies are struggling to grow and meet increasing demand for better nutrition and healthier lifestyles, while smaller brands are innovating at a dramatic pace. There is a massive move to a plant-based nutrition as a cornerstone of healthy eating. Historically, food companies first look to improve the nutritional value of their foods simply by removing the ingredients that aren't good for you. What's changing today is that innovative companies like ***TerraVia are coming to market with ingredients that can add positives for food manufacturers and their products***. Our ingredients make it easier for food manufacturers to formulate products that are better for you without sacrificing taste or texture.
>
> I believe the value we offer food companies is enormous. The ingredient is taste great. They enable healthier products. They're made sustainably. And because they are free of known allergens, they can simplify labeling and manufacturing. Our opportunity exist not just in foods per se, but more broadly in nutrition and select specialty ingredients. Commercializing this capability across these markets on a broader scale is the next step.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

30

(Emphasis added).

120.    The statements referenced in Paragraph 119 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea, vomiting, and diarrhea; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that the Company's algal products caused the aforementioned symptoms; (iv) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (v) the Company had overstated the commercial viability of its algal products, and was therefore not making strong progress commercially in food and nutrition; (vi) due to the Company's algal products causing the aforementioned symptoms, they were not "better for people and better for the planet"; (vii) because they caused the aforementioned symptoms, the Company's algal ingredients did not "add positives for food manufacturers and their products"; (viii) because they caused the aforementioned symptoms, the Company's algal ingredients did not "make it easier for food manufacturers to formulate products that are better for you"; and (ix) as a result of the foregoing, the Company's business and prospects were worse than represented.

121.    On November 4, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  In the Q3 2016 10-Q, signed by Painter, the Company stated:

> We are a food, nutrition and specialty ingredients company that harnesses the power of algae, the origin of all plants. Our innovative platform uses microalgae to produce high-value triglyceride oils, proteins, fibers, micronutrients and other ingredients. The inherent flexibility of our technology platform and the broad usage of these materials across multiple industries allow us to approach a wide range of customers across myriad end markets. We have streamlined our strategy to focus on food, nutrition and specialty ingredient products and began to more broadly commercialize these products in 2015, and in May 2016, we changed our name from "Solazyme, Inc." to "TerraVia Holdings, Inc.", and changed our Nasdaq ticker listing symbol from SZYM to TVIA. With the transition to the TerraVia brand and our refined focus on food, nutrition and specialty

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

ingredients, we announced in March 2016 our intention to attract a new CEO with proven industry experience in food and nutrition to drive commercial growth. On August 8, 2016, we announced the appointment of Apu Mody as our Chief Executive Officer, effective upon the commencement of his employment with TerraVia, which occurred on August 22, 2016. Additionally, in August 2016, we sold our Algenist skincare brand, a transaction in line with our strategy to focus efforts on core growth engines in food, nutrition and specialty ingredients.

The unique composition of our oils, powders and other algae-derived products address specific customer requirements. ***We are commercializing high-value oils and powder products with companies that primarily use them as ingredients***. We have developed and are commercializing products for specialty food ingredients, animal nutrition ingredients, consumer food products and specialty personal care ingredients. Over our history, we have also invested in and developed products, technology and market opportunities in the industrials area, which includes fuels, industrial oils, and the oilfield/Encapso® business. In line with our strategy to focus our commercial efforts on food and specialty personal care ingredients, we expect to pursue strategic alternatives for the industrials business and our objective will be to identify partners who have the operational capabilities needed to realize the potential of those businesses.

Our food oils are formulated to offer a variety of functional benefits such as enhanced structuring capabilities and stability while providing robust formulation and process flexibility. These food oils have the potential to improve upon conventionally utilized specialty fats and oils and ***our high oleic algae oil has received an FDA generally recognized as safe (GRAS) "No Questions" letter***. Currently, these oils are commercially available in our AlgaWise® branded food oil platform and in our consumer culinary oil Thrive® brand. In addition, we have developed novel methods of preparing powdered forms of triglyceride oils and vegan proteins, and our powdered ingredients are composed of unmodified whole algae cells. ***AlgaVia® Lipid Powder (commonly known as whole algae flour) and AlgaVia® Protein (commonly known as whole algae protein) are whole algae ingredients that can improve the nutritional profile of foods and beverages.*** AlgaVia® Lipid Powder is a new fat source that allows for the reduction or replacement of dairy fats, oils, and eggs. AlgaVia® Protein is a new vegan source of protein that is free of known allergens and gluten. Both AlgaVia® Lipid Powder and Protein can be used across a range of applications such as beverages (ready-to-drink and powdered), bakery, snacks, bars, dressings, sauces and frozen desserts and each ingredient received a FDA GRAS "No Questions" letter. In May 2016, we and Bunge announced that we launched a native, whole algae DHA, docosahexaenoic acid, a long chain omega-3 fatty acid as a sustainable specialty feed ingredient, prioritizing the aquaculture market.

(Emphasis added).

122.    The statements referenced in Paragraph 121 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea, vomiting, and diarrhea; (ii) Santa Cruz apprised the Company of this fact; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that the Company's algal products caused the aforementioned symptoms; (iv) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (v) the Company had overstated the commercial viability of its algal products; (vi) the Company's algal products were not "high-value" in that they caused the aforementioned symptoms, thus seriously diminishing their commercial viability; (vii) the Company's algal products did not "improve the nutritional profile of foods and beverages" where they caused the aforementioned symptoms; (viii) the FDA GRAS "No Question" letter did not designate the Company's algal products as safe; indeed, the Company had direct knowledge by this time that its algal products were not safe and had privately disseminated that knowledge; (ix) the Company's algal products could not be safely used across a range of applications because they caused the aforementioned symptoms; and (x) as a result of the foregoing, the Company's business and prospects were worse than represented.

123.    The Company provides the following descriptions of its products on its official website:

- Our microalgae-based protein platform leverages fermentation technology to produce highly nutritious, naturally derived, minimally processed ingredients with **outstanding consistency**.[10]

- AlgaVia® Whole Algae Ingredients provide **an array of benefits** that can make reduced-fat foods taste richer, vegan protein fortification simpler and the reduction of

---

[10] http://algavia.com/wp-content/uploads/2014/11/ProteinRich.pdf

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

33

saturated fat with great taste and texture possible. Experience a food revolution that makes the future bolder and brighter.[11]

• AlgaVia® Whole Algae Ingredients **help make delicious foods that are better for people and inspire solutions for a better planet**.[12]

• [Lipid Rich Whole Algae] **Deliver healthier, indulgent products without compromise**.[13]

• AlgaVia® Protein-Rich Whole Algae is vegan, **free of known allergens** and gluten-free—with additional fiber, lipids, carbohydrates and micronutrients.[14]

• AlgaVia® Protein-Rich Whole Algae delivers a unique set of functional and nutritional benefits.

    o    Whole food ingredient

    o    **Free of known allergens**

    o    Sustainable, naturally-derived

    o    Contains all essential amino acids

    o    Adds dietary fiber, healthy lipids[1] and micronutrients to food products

    o    Gluten-free, non-GMO and vegan

    o    Manufactured in the U.S.

    o    FDA GRAS No Questions Letter received

    o    **High protein digestibility**

    o    Zero to minimal impact on the texture or viscosity of a finished product

    o    Stable in a variety of temperatures and pH conditions[15]

---

[11] http://algavia.com/

[12] http://algavia.com/

[13] http://algavia.com/ingredients/

[14] http://algavia.com/ingredients/

[15] http://algavia.com/ingredients/proteins/

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(Emphasis added).

124.    The statements referenced in Paragraph 123 above were materially false and misleading because Defendants failed to disclose that: (i) ingestion of the Company's algal products caused gastrointestinal distress, including nausea, vomiting, and diarrhea; (ii) the Company had been apprised of this fact by Santa Cruz; (iii) the Company had sent the Honey Stinger letter to Santa Cruz and other customers and distributors, establishing its knowledge that the Company's algal products caused the aforementioned symptoms; (iv) the Company's algal products were therefore unlikely to be a competitive product in the market for nutrition foods; (v) the Company had overstated the commercial viability of its algal products; (vi) the Company's algal products were not "better for people" given that they caused the aforementioned symptoms; (vii) the Company's algal products were not "healthier" given that they caused the aforementioned symptoms; (viii) the Company's algal products created allergic reactions in consumers, including the aforementioned symptoms; (ix) the Company's algal products did not boast "high digestibility"; to the contrary, they caused gastrointestinal distress; and (x) as a result of the foregoing, the Company's business and prospects were worse than represented.[16]

**The Truth Emerges**

125.    On November 7, 2016, the *Bloomberg* article (see Paragraph 13 above) was published at the same time the market opened, revealing publicly that Soylent had identified TerraVia's alga flour as the source of the gastrointestinal ailments plaguing its consumers.

126.    On this news, the Company's share price fell $0.15 per share, or 8.11%, to close at $1.70 per share on November 7, 2016, thereby damaging investors:

---

[16] Plaintiff's allegations regarding Defendants' false and misleading statements and/or omissions are summarized in the chart attached hereto as Appendix 1.



127.   On November 10, shares slid another 6.25% to close at $1.50.

128.   *The Motley Fool* described Soylent's bombshell as "terrible news – and it appears to get worse still."   The report then contrasted Brooks's public denials with *Bloomberg*'s reporting on the Honey Stinger letter.

129.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

130.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TerraVia securities traded on NASDAQ during the Class Period; and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and

directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

131.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by TerraVia or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

132.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

133.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

134.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TerraVia;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

37

- whether the Individual Defendants caused TerraVia to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of TerraVia securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

135.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

136.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- TerraVia securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold TerraVia securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

138.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**Violation of Section 10(b) Of**
**The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

139.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (2) cause plaintiff and other members of the Class to purchase TerraVia's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

141.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for TerraVia's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

142.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of TerraVia as specified herein.

143.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TerraVia value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about TerraVia and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of TerraVia securities during the Class Period.

144.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and

reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

145.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

146.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of TerraVia's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of TerraVia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclose in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired TerraVia securities during the Class Period at artificially high prices and were or will be damaged thereby.

147.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding TerraVia financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or

otherwise acquired their TerraVia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

148.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

149.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

150.   This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

<u>**COUNT II**</u>
**Violation of Section 20(a) Of**
<u>**The Exchange Act Against Individual Defendants**</u>

151.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152.   The Individual Defendants are sued herein as a controlling person of TerraVia.

153.   By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violator, including the content and dissemination of the various statements that plaintiff contends are false and misleading. In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

154.   As set forth above, TerraVia violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

42

155.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

156.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 26, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Louis C. Ludwig*
Patrick V. Dahlstrom

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Louis C. Ludwig
Ten South La Salle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
E-mail:  pdahlstrom@pomlaw.com
E-mail:  lcludwig@pomlaw.com

**POMERANTZ, LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

***Lead Counsel***

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com

***Additional Counsel for Plaintiff***

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


*/s/     Louis C. Ludwig*
Louis C. Ludwig